In the

# United States Court of Appeals
### For the Seventh Circuit

———————

Nos. 06-4019 & 07-1400

NAUTILUS INSURANCE CO.,

*Plaintiff-Appellee,*

*v.*

DAVID REUTER, Individually and as
Representative of the Estate of Shirley
Reuter, and JUSTIN L. CHRETIEN,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 30—**Allen Sharp**, *Judge.*

———————

ARGUED DECEMBER 7, 2007—DECIDED AUGUST 8, 2008

———————

Before EASTERBROOK, *Chief Judge*, and MANION and
KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* After numerous small corpora-
tions submitted claims to Nautilus Insurance Company
("Nautilus") for the insurer's defense and indemnity for
lawsuits the small corporations were facing, Nautilus
sought a declaration that it did not owe such duties to the
small corporations for the underlying claims. The insur-
ance policies did not contain choice-of-law provisions; as
a federal court sitting in Indiana, the district court

applied Indiana choice-of-law rules to choose which state
had the most intimate contacts with the contracts. After
deciding that Indiana law governed the interpretation of
the contracts, the district court granted summary judg-
ment in favor of Nautilus on the ground that Indiana
law does not contemplate insurance coverage for the
types of claims arising under the insurance policies held
by the insureds—claims for negligent hiring. The district
court correctly applied Indiana law to the insurance
policies involving two of the small corporations involved
in this appeal. However, for the insurance policies involv-
ing one of the corporations, Phoenix Imagery, there is
conflicting evidence about the small corporation's prin-
cipal place of business. Because we cannot resolve the
conflict on the basis of the paper record, we remand this
particular choice-of-law determination to the district
court for further proceedings, such as an evidentiary
hearing.

## I. HISTORY

This insurance-coverage case arose after several individ-
uals tragically suffered violent crimes committed by door-
to-door magazine salespersons. The assailants were
employees of small corporations associated with Ameri-
can Community Services ("ACS"), an Indiana-based
magazine clearinghouse that sells magazines by con-
tracting with small corporations that, in turn, hire and
employ their own door-to-door salespersons. The small
corporations that employed the violent offenders were
insured by Nautilus; ACS was listed as an additional
insured on each of the relevant Comprehensive General
Liability ("CGL") policies. When numerous civil lawsuits
were brought against the small corporations and ACS by

the victims of the crimes and their families, the insureds submitted claims to Nautilus, requesting the insurer's defense and indemnification. Nautilus then filed this suit in federal district court, under 28 U.S.C. § 1332, seeking rescission of the contracts and a judgment declaring that it did not owe duties of defense or indemnification under the CGL policies. Nautilus explained that the civil complaints alleged only negligent hiring by the small corporations and ACS, but in Indiana, negligent hiring and negligent supervision do not fall within the ambit of traditional CGL coverage, where an "occurrence" is defined as an accidental event. *See Erie Ins. Co. v. Am. Painting Co.*, 678 N.E.2d 844, 846 (Ind. Ct. App. 1997). Nautilus argued that Indiana law governed the insurance contracts, because the small corporations were incorporated in Indiana and were mere "shells" of ACS.

The insurance policies secured by the small corporations (in which ACS is listed as an additional insured) contain no choice-of-law provisions. The small corporations were all incorporated in Indiana, but Illinois addresses were listed on their insurance applications. Accordingly, the insurance policies listed the corporations' locations at the Illinois addresses. The insurer (Nautilus or its agent, Jimcor) paid taxes on the policies in Illinois, and the policies were stamped by the Illinois Department of Insurance, in accordance with Section 445 of the Illinois Insurance Code, which outlines the requirements for "surplus line insurance" that insures an "Illinois risk." 215 Ill. Comp. Stat. 5/445.

The choice-of-law determination is especially important in this case because the substantive law in Indiana and Illinois differs on the point of law at the heart of the underlying lawsuits against the magazine-sale corpora-

tions: whether negligent hiring can constitute an "occurrence" under an insurance policy. Under Indiana law, allegations of negligent hiring do not trigger an insurer's duties to defend and indemnify the insured if the policy defines "occurrence" as an accidental event. *See Am. Painting Co.*, 678 N.E.2d at 846. But under Illinois law, negligent hiring can constitute an "occurrence" under insurance policies that define the term as an accidental event. *See Am. Family Mut. Ins. Co. v. Enright*, 781 N.E.2d 394, 398-400 (Ill. App. Ct. 2002).

Nautilus named as defendants in its declaratory action ACS, the numerous small corporations that submitted claims to Nautilus for defense and indemnification, and the individual plaintiffs who had filed lawsuits against ACS and the small corporations, including David Reuter, individually and as a representative of the Estate of Shirley Reuter, and Justin Chretien. Shirley Reuter, David Reuter's mother, was murdered by a door-to-door salesman in her New Jersey home, and Justin Chretien was assaulted by a salesman in Virginia. In their respective lawsuits, David Reuter sued ACS and the small corporations Phoenix Imagery and G.O. Innovators; Chretien sued ACS and the small corporation Unified Stars.

The parties engaged in extensive discovery, which included document production, interrogatories, depositions, and declarations. The gathered evidence—which will be discussed more thoroughly below as it relates to the choice-of-law analysis—showed that the states of Illinois and Indiana both have contacts with the insurance contracts.

Following cross-motions for summary judgment, the district court granted summary judgment in favor of

Nautilus. It concluded that Indiana law applied to the insurance policies and consequently, that Nautilus had no duty to defend or indemnify ACS or the small corporations in the civil lawsuits. The district court observed that ACS is an Indiana corporation with its principal place of business in Indiana. It labeled all of the small corporations "Shell Corporations" of ACS, and found that each had an Indiana registered agent. The court also relied on the fact that ACS procured the insurance policies for the small corporations from its base in Michigan City, Indiana. On these facts, the district court decided: "All of that is enough to get this court to the substantive law of Indiana with regard to the key question about the contents of the insurance contract here."

## II. ANALYSIS

Neither ACS, nor any of the small corporations, appealed from the judgment. Of the individually named defendants, only Reuter and Chretien have appealed. Reuter and Chretien have a strong pragmatic interest in the application of Illinois law—so the insurer (with its deep pockets) may be liable for costs attributable to the allegedly negligent small companies (with their very shallow pockets).[1]

---

[1] Nautilus's declaratory-relief action named numerous small corporations as defendants. However, because Reuter and Chretien are the only parties appealing the district court's decision, the only small corporations relevant to this appeal are those implicated by Reuter's and Chretien's underlying lawsuits: Phoenix Imagery, G.O. Innovators, and Unified

(continued...)

Reuter and Chretien argue that the district court improperly pierced ACS's corporate veil by concluding that the small corporations were "shells" of ACS, and that the district court erred by deciding that the substantive law of Indiana, and not Illinois, governed the construction of the insurance policies. Reuter and Chretien contend that Illinois law should have applied because Illinois had the most intimate contacts with the insurance contracts. *See* Restatement (Second) of Conflicts § 188 (1971). Reuter and Chretien claim that the district court erred by granting summary judgment in favor of Nautilus as a result of its erroneous choice of law. Nautilus continues to use the "shell" terminology for the small corporations, and insists that the district court correctly applied Indiana law to the insurance policies.

The selection of one state's substantive law over another in the event of a conflict presents a question of law that is decided by the court. *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 571 (7th Cir. 1995). We review that selection *de novo. Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). The district court, sitting in diversity, used

(...continued)

Stars. Even though Reuter and Chretien are not parties to the insurance contracts at issue, they have standing to appeal because they were named defendants in the district court action. *See Essex Ins. Co. v. Kasten Railcar Servs., Inc.*, 129 F.3d 947, 948 (7th Cir. 1997). However, their standing is limited to the extent that the district court decision harmed them, that is, to the extent that it involves the corporations against whom Reuter and Chretien brought lawsuits. *See Chase Manhattan Mortgage Corp. v. Moore*, 446 F.3d 725, 727 (7th Cir. 2006) (explaining that if an appellant is not harmed by a judgment, he lacks standing to appeal).

Indiana choice-of-law principles to determine "which state's substantive law governs the proceeding." *Id.*; *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Indiana's choice of law rule for contract actions calls for applying the law of the forum with the most intimate contacts to the facts." *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999). This approach is embodied in the Restatement (Second) of Conflicts, *id.*, and calls for consideration of the following factors: "(a) the place of contracting; (b) the place of contract negotiation; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties," *id.* (citing *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623, 626 (Ind. Ct. App. 1983)); Restatement (Second) of Conflicts § 188 (1971).

In its choice-of-law analysis, the district court noted that ACS is an Indiana corporation with its principal place of business in Michigan City, Indiana. It then stated that "most of the remaining defendants are so-called Shell Corporations with an Indiana registered agent." A shell corporation is " 'a company that is incorporated, but has no significant assets or operations.' " Shell (corporation) Wikipedia Entry, http://en.wikipedia.org/wiki/Shell_(corporation) (last visited June 26, 2008) (quoting *Barron's Finance & Investment Handbook*); *see also* Guidance Memorandum from the Department of the Treasury, Financial Crimes Enforcement Network 1 (Nov. 9, 2006), *available at* http://www.fincen.gov/statutes_regs/guidance/pdf/AdvisoryOnShells_FINAL.pdf   (stating that shell companies "typically have no physical presence (other than a mailing address) and generate little or no

independent economic value"). Shell companies are not in themselves illegal, *see* Guidance Memorandum, *supra*, at 1-2, but may be used by another corporation or entity to advance fraud by way of the shell's "front." *See HOK Sport, Inc. v. FC Des Moines, L.C.*, 495 F.3d 927, 936 (8th Cir. 2007) ("[P]iercing the corporate veil is appropriate if the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (internal quotation omitted)).

The district court apparently assumed the small corporations were shells. Because there was no analysis in the district court opinion to support the statement that the small corporations were shells, we do not read the court's invocation of the "shell" terminology to be a factual finding that the corporations existed as shams, solely to facilitate ACS's alleged fraud. The district court's dismissal of the plaintiff's rescission claims as moot supports our conclusion that the district court made no finding of fact about the legitimacy of the small corporations. Had the court actually concluded that the small corporations were shams that existed solely to further ACS's fraud, then Nautilus would have been granted rescission of the insurance policies under either Illinois or Indiana law. *See Va. Sur. Co., Inc. v. Bill's Builders, Inc.*, 865 N.E.2d 985, 992 (Ill. App. Ct. 2007); *Jesse v. Am. Cmty. Mut. Ins. Co.*, 725 N.E.2d 420, 424-25 (Ind. Ct. App. 2000).

On the record before us, it is not clear that the small corporations were illegitimate, sham corporations under either Indiana law or Illinois law. Although it is evident that the small corporations operated to the benefit of ACS, that fact alone does not render the corporations alter egos of one another. In fact, the record contains evidence that the small corporations maintained operations independ-

ent from their dealings with ACS. The Independent Contractor agreements between the small corporations and ACS provide that the small corporations are free to work with other magazine clearinghouses. Lynne Harvey, the President of Phoenix Imagery, attested that she was not an employee of ACS, and that she alone controlled the operations of Phoenix. She explained that Phoenix reimbursed ACS for its insurance premiums, and that Phoenix's principal place of business was in Crete, Illinois. Additionally, ACS denied that it operated as a single business enterprise with the small corporations.

On the other hand, there is evidence in the record that supports Nautilus's shell theory. The address provided by Lynne Harvey for Phoenix's principal place of business is actually the residential address of ACS's founders. Phone numbers listed for some of the small corporations overlap with phone numbers for ACS. ACS personnel are listed as contact persons for some of the small corporations in insurance documents and marketing materials. Additionally, the record is devoid of Independent Contractor agreements between G.O. Innovators and ACS, and between Unified Stars and ACS, and neither of those two small corporations responded to Nautilus's discovery requests.

With the conflicting evidence regarding the nature of the small corporations, we are not comfortable piercing ACS's corporate veil and declaring the small corporations to be "shells" that existed solely to allow ACS to perpetrate insurance fraud. To resolve that conflict at this point—where there are factual disputes surrounding the nature of the small corporations and their relationships with ACS—would effectively relieve Nautilus of its burden (under either Illinois law, *see Pederson v. Paragon*

*Pool Enters.*, 574 N.E.2d 165, 167 (Ill. App. Ct. 1991), or Indiana law, *see Cmty. Care Centers, Inc. v. Hamilton*, 774 N.E.2d 559, 564-65 (Ind. Ct. App. 2002)) of proving that the small corporations and ACS were alter egos of one another, and that they should be treated as the same entity for all purposes, including for choice-of-law determinations surrounding insurance policies.

One of the factual disputes at the heart of Nautilus's "shell" argument mirrors the dispute at the heart of the choice-of-law determination—that is, whether the small corporations' principal places of business are in Indiana, or alternatively, in Illinois. The first four factors outlined in § 188 of the Restatement (Second) of Conflicts do not conclusively call for application of the substantive law of either Indiana or Illinois, so the domicile, residence, nationality, place of incorporation and place of business of the parties is particularly important. *See* Restatement (Second) of Conflicts § 188. We turn now to the Restatement factors to decide whether Indiana had the most intimate contacts to the facts of the insurance contracts with each of the three small corporations.

*A.  Place of contracting*

The comment to § 188 instructs that the place of contracting is "the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect . . . ." Restatement (Second) Conflicts § 188 cmt. e. The place of contracting, standing alone, is often insignificant. *Id.* In several recent Indiana cases dealing with contractual negotiations between insureds, their agents, and insurers in different states, the place of contracting was deemed "indeterminate" by the

Indiana Court of Appeals. *See Am. Employers Ins. Co. v. Coachmen Indus., Inc.*, 838 N.E.2d 1172, 1178-79 (Ind. Ct. App. 2005); *Recticel*, 716 N.E.2d at 1023; *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 932 (Ind. Ct. App. 1999); *Hartford Accident & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 293 (Ind. Ct. App. 1997). In *Recticel*, the insured sometimes listed its address in Indiana, and other times in New York, but the insured "managed its insurance affairs" in Indiana. Even so, the Indiana Court of Appeals decided that the place of contracting was "not deter-minative." 716 N.E.2d at 1023.

From the testimony of Tina Green, ACS's office manager, it appears that ACS initially procured the insurance policies on behalf of the affiliated small corporations, from its location in Indiana. Thereafter, ACS charged the cost of the insurance to the small corporations' accounts with ACS. Lynne Harvey, of Phoenix Imagery, confirms that she "reimbursed" ACS for the cost of Phoenix's insurance premium.

The insurance agent with whom ACS communicated, John Damiani, worked for Sun Insurance in New Jersey. The policies were ordered from and underwritten by Jimcor, a Pennsylvania insurance agency. The ultimate insurer, Nautilus, is incorporated in Arizona, and has its principal place of business there. The policies were stamped by the Illinois Department of Insurance, in accordance with Section 445 of the Illinois Insurance Code, which outlines the requirement for "surplus line insur-ance" that insures an "Illinois risk." 215 Ill. Comp. Stat. 5/445. Illinois law provides that it is "unlawful for an insurance producer to deliver any unauthorized insurer contract unless such insurance contract is countersigned by the Surplus Line Association of Illinois."

With all of the different parties involved in these particu-
lar insurance contracts—ACS, Sun Insurance, Jimcor,
Nautilus, the small corporations, and the Illinois Depart-
ment of Insurance—it is impossible to pinpoint the place
of contracting. Under Illinois law, the contract could not
be delivered, and thus could not come into effect, until it
was approved by the Surplus Line Association of the
state. That fact weighs in favor of applying Illinois law
to the contracts. On the other hand, the Indiana Court of
Appeals has downplayed the significance of counter-
signatures that are required by state law as indicators of
the place of contracting—at least where the countersigna-
tures are of the *insurer's* registered agent. *See Dana Corp.*,
690 N.E.2d at 293. Like the Indiana Court of Appeals in
*Coachmen*, "we cannot conclusively point to [Illinois or
Indiana] as being the state where 'the last act necessary' to
give the contract binding effect occurred . . . ." *Coachmen*,
838 N.E.2d at 1179. So we conclude that this factor is not
determinative.


### B.  Place of negotiation of contract

Normally, the place of a contract's negotiation is a
"significant contact." Restatement (Second) of Conflicts
§ 188 cmt. e. The state where contract negotiations occur
has an interest in the legality of the negotiations them-
selves, as well as the ultimate agreement. *See id.* However,
"[t]his contact is of less importance when there is no one
single place of negotiation and agreement, as for example,
when the parties do not meet but rather conduct their
negotiations from separate states by mail or telephone." *Id.*

The testimony of ACS's office manager confirms that
ACS negotiated for the insurance policies on behalf of

the small corporations. Those negotiations took place by phone, between an ACS employee in Indiana, and John Damiani, at Sun Insurance in New Jersey. In turn, Damiani worked with Jimcor, the Pennsylvania Insurance agency—the communications between Damiani and Jimcor seemed to have occurred by fax and e-mail. In *Coachmen*, the Indiana Court of Appeals noted that because some of the negotiations were done by mail, fax, or phone between individuals in different states, "there [was] not a single place of negotiation." *Id*. The court could not say the place of negotiation was conclusive, and found the factor indeterminate. *Id.* Likewise, we cannot identify a particular place of negotiation because the evidence shows that parts of the negotiations took place in Indiana, New Jersey, and Pennsylvania. Notably, none of the negotiations took place in Illinois.

## C. *Place of performance*

The place of performance "is the location where the insurance funds will be put to use." *Id.* at 1180. If a contract is to be performed in a particular state, that state has "an obvious interest in the nature of the performance and in the party who is to perform." Restatement (Second) of Conflicts § 188 cmt. e. However, the place of performance will not significantly affect the choice-of-law analysis when "(1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue*." Id.* The "performance" at issue in these insurance contracts is the insurance of a corporation that sells magazines door-to-door in numerous states. The actual incidents for which the small corporations submitted claims to

Nautilus occurred in New Jersey and Virginia. At the time of contracting, the specific states from which insurance claims would arise was not known, so, this factor also is indeterminate of which state's law to apply. *See id.*

 D.  *Location of the subject matter*

The subject matter of the insurance policies at issue is not a tangible object, the location of which could be limited to one state. However, it should be noted that the insurer's compliance with requirements with Illinois law for providing surplus line insurance indicates that Nautilus, through Jimcor, intended to insure risks located, to some extent, in Illinois.

Additionally, the insurance policies themselves suggest that Nautilus committed to insuring risks in Illinois. The policies for each corporation identify the name and address of the insured. The policy period is listed, and is followed by the phrase "at your mailing address shown above." The addresses shown above are Illinois addresses. Further, the policies ask for the "location of all premises you own, rent, or occupy," and the policies state, "same as mailing address," again, all of which are listed in Illinois.

Nautilus argues that the Illinois addresses are shams, and that it would not have insured the small corporations had it known the truth about their relationships with ACS. This contention brings us to the next § 188 factor—if the small corporations are truly Indiana corporations, then Indiana law should apply. If, on the other hand, they are Illinois corporations, then Illinois law should apply.

*E. Domicile, residence, nationality, place of incorporation and place of business of the parties*

Because the first four factors are so inconclusive, this factor becomes pivotal. All of the insureds—Phoenix Imagery, G.O. Innovators, and Unified Stars—are incorporated in the state of Indiana. However, "[a]t least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter state." Restatement (Second) of Conflicts § 188 cmt. e. ACS, the additional insured on each of the policies, has its primary place of business in Indiana. The determination of the primary places of business for the three small corporations is more difficult.

Lynn Harvey, President of Phoenix Imagery, stated in a declaration that the principal place of business for the corporation from the date of its formation until June 2004, was in Crete, Illinois. However, the address she provided for Phoenix's principal place of business is that of the residential home of ACS's founders, in Crete. The phone number Phoenix Imagery provides to customers is the Indiana number for ACS. These pieces of evidence together are suspicious—does Harvey work out of somebody else's home? Is Phoenix Imagery truly a separate entity from ACS? Harvey's declarations that she is the sole decision-maker and manager of Phoenix, and that Phoenix Imagery's principal place of business is in Illinois, appear to conflict with other evidence suggesting that Phoenix is, in fact, an alter ego "shell" of ACS, operating out of Indiana. By failing to respond to Nautilus's requests for admission, Phoenix Imagery admitted (via Fed. R. Civ. P. 36) to using the mailing address for

ACS, in Indiana; obtaining its insurance through its contacts with ACS; allowing ACS to "terminate" its salespersons in the event of complaints of misconduct from customers; accepting advisement from ACS relating to the accounting, record keeping, and management of its business; and allowing its employees to wear ACS identification badges when selling magazines door-to-door.

Ultimately, we cannot tell from the evidence whether Phoenix Imagery principally operates out of Illinois, or whether the corporation is a shell of ACS. Its links with Illinois are established by its President's declaration and by its Independent Contractor agreement with ACS. But that evidence is weakened by other evidence that suggests the small corporation is not an independent entity and that its business address in Crete, Illinois, is a sham.

As for G.O. Innovators and Unified Stars, these two small corporations did not respond to Nautilus's complaint—they failed to file answers or to otherwise defend against the lawsuit. The record does not contain Independent Contractor agreements between ACS and these corporations (as it does for Phoenix Imagery), which would have been useful for identifying the corporations' principal places of business. All we know about G.O. Innovators and Unified Stars with respect to this factor of § 188 is that they are both incorporated in Indiana and have registered agents in Indiana, but they listed their addresses on the insurance-policy materials in Illinois. These small corporations may have operated out of Illinois, but they also may have operated out of Indiana. The only definite evidence linking them to Illinois appears in their insurance materials. For the purposes of this § 188 factor, the scale tips in favor of applying Indiana law, because G.O. Innovators and Unified Stars are incorporated in Indiana.

*F.  Choice of law determination*

After considering the various Restatement factors, we find that "none of the § 188 factors is compelling or conclusive." *Coachmen*, 838 N.E.2d at 1181. So, we will consider the "overall number and quality of contacts," *id.*, to decide whether we agree that the district court should have applied Indiana law to the insurance policies. The first factor—place of contracting—while not determinative, involved the states of Indiana (ACS), New Jersey (Sun Insurance), Pennsylvania (Jimcor), and Illinois (Illinois Department of Insurance). The negotiations for the contracts—factor two—took place over the phone and through other means of long-distance communication, between the parties in Indiana, New Jersey, and Pennsylvania. The place of performance was unknown at the time of contracting because the magazine-sales corporations conducted their business in various states. The fourth factor—location of the subject matter—tips the analysis slightly in favor of the application of Illinois law, because the insurance policies indicate that they are for a certain time period, "at" the specified locations in Illinois. Additionally, Jimcor referred to the policies as "IL policies" in some of its communications, which indicates an intention to insure risks in Illinois. Finally, under the fifth factor, we identified a factual dispute about Phoenix Imagery's principal place of business; we could not determine the principal places of business of G.O. Innovators and Unified Stars, both of which are incorporated in Indiana.

The fact that we know nothing about the principal places of business of G.O. Innovators and Unified Stars makes it difficult for us to conclude that anything other than Indiana law applies to their insurance policies. What we know about these two corporations ties them to

Indiana—except for the Illinois addresses that were used on the insurance applications, which are not corroborated by any other documentation or evidence. They are incorporated in Indiana and ACS procured the insurance contracts on their behalf from its base in Indiana. If we were to apply Illinois law for the insurance policies involving these two corporations, we would effectively replace the multi-factor approach outlined in § 188 with a single-factor determination by which the law of the state identified on the insurance policy would automatically govern a contract dispute, absent a choice-of-law provision. We agree with the district court that, based on the factors enunciated in § 188, the state of Indiana had the most intimate contacts with the insurance policies of G.O. Innovators and Unified Stars. And, the district court correctly interpreted Indiana law to preclude coverage under the CGL insurance policies for claims of negligent hiring, *see Am. Painting Co.*, 678 N.E.2d at 846. Summary judgment in favor of G.O. Innovators and Unified Stars was proper.

With respect to Phoenix Imagery, on the other hand, there is evidence suggesting that the small corporation might be legitimate, and that it might have its principal place of business in Illinois. Though, conflicting evidence calls into question the truthfulness of Lynne Harvey's declaration to that effect. We, as an appellate court, cannot resolve this factual dispute. Because the district court decides as a preliminary matter which substantive law to apply, *see Gramercy Mills, Inc.*, 63 F.3d at 570, we are of the opinion that the district court must also resolve factual disputes that bear on the choice-of-law determination. *See Vaz Borralho v. Keydril Co.*, 696 F.2d 379, 386 (5th Cir. 1983) (upholding judicial resolution of facts affecting

choice-of-law determination); *but cf. Marra v. Bushee*, 447 F.2d 1282, 1284-85 (2nd Cir. 1971) (deciding that resolution of factual issues bearing on choice-of-law determination belonged to jury). In this case, the district court needs to decide whether Phoenix Imagery is a legitimate corporation operating out of Illinois—if it is, then Illinois law should govern its insurance policies. The most direct way to make such a determination would be for the district court to hold an evidentiary hearing to assess the veracity of Lynne Harvey's statements.

It might seem odd to charge the district court with resolving a factual dispute that could affect the rights and liabilities of the litigants—such disputes are ordinarily within the province of the jury. But, presenting the choice-of-law factual issue to a jury in this instance is even more problematic. As we pointed out in *Gramercy Mills*, "it would make little sense to let a jury decide which facts are true and then to say that there was never a dispute to begin with." *Id.* And, as we noted recently in *Pavey v. Conley*, 528 F.3d 494, 496-97 (7th Cir. 2008), "not every factual issue that arises in the course of a litigation is triable to a jury as a matter of right." We explained that matters of subject-matter jurisdiction, personal jurisdiction, venue, and abstention are often decided by the judge "even if there are contestable factual questions bearing on the decision." *Id.*

Without knowing which state's substantive law governs this dispute, the case cannot move forward. But without resolving the contested issues of Phoenix's corporate status and its principal place of business, the choice-of-law determination cannot be made. Thus, we vacate in part and remand for the district court to make factual findings about Phoenix Imagery, and then to reconsider the choice-of-law analysis based on the results of its inquiry.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM in part and VACATE in part the district court's judgment, and REMAND for further proceedings.